## SAGER *versus* THE PORTSMOUTH, S. & P. & E. RAIL ROAD COMPANY.

The common law liability of a common carrier, may be restricted by a notice from him, brought home to the knowledge of the customer, as to the extent of the liability to be borne by the carrier.

But no *notice* or *contract* can exonerate a common carrier from liability for damage, occasioned by his *negligence* or *misconduct*.

The want of suitable vehicles, in which to transport articles, is negligence on the part of a carrier.

A common carrier will be liable for damage to goods, resulting from disobedience of the directions, given by the owner and assented to by the carrier, respecting the mode of conveyance.

If, with a *bailee* employed to carry goods for him, the owner stipulate to take upon himself the risk of "all damages, *that may happen*" to the goods in the course of transportation, such stipulation will not exonerate the bailee from liability for damage to the goods, resulting from his *negligence* or *misconduct*.

The damages, which, within the meaning of that stipulation, *might happen* to the goods, would not include such as resulted from *negligence* or *misconduct*.

Such stipulation, however, would cast upon the owner, the burden of proving that the damage was *so* occasioned.

ASSUMPSIT. The plaintiff's horse was transported upon the defendants' rail way from Boston to Portland, for which the plaintiff paid freight, $2,75. It was upon a cold day in November, 1848. The horse was carried in an open car, and suffered serious injury from the exposure to the cold. This action is brought to recover for that injury.

A witness for the plaintiff testified, that he took the horse to the depot in East Boston, and requested one of the defendants' servants there to have the horse carried in a close car. He did not know the name of the servant, nor whether he had any charge in the transportation department.

The defendants introduced a paper, made in 1845, signed

Sager *v.* Portsmouth, S. & P. & E. Rail Road Co.

by the plaintiff and many other dealers in horses and cattle, as follows: " We the undersigned, hereby agree to exonerate the P., S. & P. & E. Rail Road Company from all damages that may happen to any horses, oxen or other live stock that we send or may send over said company's rail road; meaning by this, that we take the risk upon ourselves of all and any damages, that may happen to our horses, cattle, &c.; and that we will not call upon said rail road company or any of their agents for any damages whatever."

The trial was before HOWARD, J. He instructed the jury *that*, by the common law, common carriers for hire were always bound to obey special directions given them as to the manner of transporting property entrusted to them; *that* they were bound to provide themselves with suitable carriages and conveyances; *that* they were bound to guard against improper hazards and injury to the property by storms; *that* they were liable for losses which might happen by injuries of every kind to such property, except those which occur from the act of God or public enemies; *that* the burthen of proof is on the defendants to show, when any loss happens, that it is not occasioned by their fault; *that* they are held to give and prove the excuse; and *that* this is the law, unless otherwise provided by special contract between the parties; *that*, by such special contract, they might guard against such an extent of liability; *that* the paper, signed by the plaintiff, might not excuse the defendants for every sort of accident, though happening without their fault; but that the same is a binding contract and excuses the defendants from liability for such losses as are incurred by the running off of the cars from the track, breaking the legs of live stock and the like accidents, but does not excuse them for their own malfeasance, misfeasance or negligence; *that* this contract shifts the burthen of proof to the plaintiff, and requires of him to prove that the loss was occasioned by the misconduct or neglects of the defendants; *that* parties have the right thus to change their liabilities; *that*, if the plaintiff gave the defendants special directions as to the mode of

carrying this horse, the defendants were bound to follow them, if they undertook to transport the property, or they could not avail themselves of the change of liabilities, provided for in the said paper; and *that* it would be such negligence, if they did not conform to these directions, as would make them liable for the loss, notwithstanding this written agreement; *that* such an omission to follow the orders given, again shifted the burthen of proof to the defendants to make good their excuse, and they would be bound to show *that* the loss was suffered without their fault; *that*, if the plaintiff relied upon having given directions to carry. the horse in a close car, he must prove that such orders were given to the defendants or their officers, or to some agent of the company; *that* it was not necessary that this order should be proved to have been given to *that* officer of the company who had in charge the carrying of such freight to Portland, but it was enough if such order was given to any agent of the company there acting for them, whatever may have been the particular duty of such agent; but that the plaintiff was bound to bring the knowledge of the special directions home to the company; *that*, if no special directions were given to carry this horse in a close car, the jury would next consider and find, whether it was an act of negligence to transport the horse in an open car; *that*, if it was known to be the custom of the defendants to transport horses in either kind of car indiscriminately, the plaintiff would be bound by such custom, if there were no special directions; *that* the jury would next inquire, if they came to the question of damages, whether the horse was injured in the course of his transportation to Portland, and whether such injury was occasioned by the neglect of the defendants; *that* this was the rule, whether the special directions were given or not.

The jury returned their verdict for the plaintiff and assessed the damages at $155.

By agreement of the parties, the case was submitted to the court for a decision upon the principles of law.

*Deblois,* for defendants.

Two points are here presented.

1. Upon the effect of the paper signed by the plaintiff. Whatever be its import, it is binding upon the plaintiff.

That paper expressly relieves the defendants from the liability charged. He thereby became his own insurer, and the employees of the defendants, became his servants.

Fraud alone could make the company liable. *Bean* v. *Green & al.* 12 Maine, 422 ; *Parker* v. *Flagg,* 26 Maine, 181 ; *Holliston* v. *Nowland,* 19 Wendell, 247 ; *Bingham* v. *Rodgers,* 6 Watts & Sergent, 495 ; Story on Bailments, sect. 554, 555, and note to 557 ; *Riley* v. *Horn,* 5 Bingham, 217 ; *Mayhew & al* v. *Eames & al.* 3 Barnwell & Creswell, 601 ; *Clark* v. *Hutchins,* 14 East, 475 ; *Beck* v. *Evans,* 16 East, 245 and 247.

As to the plaintiff, the defendants are not bound by the rules relative to common carriers.

The making of such a contract, impugnes no policy or law.

The law of common carriers arose from the necessities of a semi-barbarous age. The progress of events has removed the occasion for it, and its rigors have been mitigated, so far as to give a qualified effect to notices. The question now arises, whether, by *express contract,* a party can cast off the obligations of a common carrier.

A party may waive any right, except as to immoral tendencies, or such *crassa negligentia* as amounts to fraud. An owner of goods has the right to say to a carrier, you may transport goods for me, exempt from the rigors of the ancient law.

The charge to the jury in this case, restricted that right. The plaintiff's stipulation protected us against "all damage," the Judge limited it to damage from common and ordinary accident. Except for the protection, given by that paper, the defendants would not have carried the horse ; at least not for that price.

If mere *notice* of a restricted obligation, on the part of a

carrier, protects him, surely a written contract will be no less available.

If *notice* takes away the character of a common carrier, *a fortiori* a contract may do it.

Suppose a notice would relieve merely from common and ordinary accidents, yet a *contract* may relieve from losses even through gross neglect.

The defendants dislike to carry such freight. They consent only upon the owners assuming the risk. This is no invasion of policy, of law or of justice.

2. The direction to carry in a covered car, was not so given as to create an obligation upon the company. They have five or six hundred employees, in many various departments. To whom was the direction given? No one can tell. It should have been given to some one, having charge of the freight business. A notice to the baggage-master could have been of no use to the company. The company has usages. People employing them must deal according to those usages, and they must take time to know and to conform to them. This is the more requisite, from the rapidity of rail road movements. 22 Pick. 24; 1 Metc. 294; 4 Paige, 127.

*S. Fessenden* on the same side.

How far the rigid law of England is in force here, has never been presented, on solemn argument, to this court.

*Cessante ratione, cessat lex*, is a sound rule.

From the half-barbarism which gave rise to the old law, this nation has emerged into civilization and moral light. If parties, by their silence, acquiesce in the rigors of the old rule, let it be so. But I have yet to learn, that, in modern days, (when the chief dangers, against which that rule was adopted, have passed away,) the party may not, *by contract*, relieve himself from an insurance upon property conveyed.

The law of common carriers does not apply to the carrying of cattle and horses. It related only to money and merchandize. The transporting of live stock is of modern origin. Defendants are not bound to carry it. As well may it be re-

Sager *v.* Portsmouth, S. & P. & E. Rail Road Co.

quired of them to transport meeting houses and ships. Must they take caravans of wild animals ? Is a steam boat or rail way, bound as they are to carry *passengers*, compellable to mix them up with *lions*, *hyenas* and *monkeys ?* Suppose a person becomes a carrier to distribute newspapers ; is he compellable to transport rocks and piles of manure ?

Besides, their charter itself, section three, gives the defendants the right to decide what descriptions of articles to carry. They are not bound to provide, beforehand, vehicles for every possible sort of property. They have indeed provided cars for cattle, but to be used only on condition that the insurance is taken by the owners.

The contract made by the plaintiff with the defendants, was not void for want of consideration ; it sanctions no immorality, is not *contra bonos mores.* Suppose it should be thought the better policy to uphold the old rule, and to set aside the contract, I submit to this Honorable Court, that they have no right to do it. Such a decision would impair the obligation of a contract. Such a decision is forbidden by an express provision of our constitution. Public policy may change. But that provision is unalterable.

Even the ancient law had one qualification. The owner might go with his goods and take charge of them, at his own risk. I suppose, too, he might send his servant. So in this case, the plaintiff having taken the risk, made the defendants' employees his servants. At any rate, the contract protects the defendants against all but fraud or gross neglect. That either of these occurred, there is no pretence.

*Shepley & Dana*, for plaintiff.

SHEPLEY, C. J. — It cannot be useful to notice or to attempt to reconcile the very numerous opinions and decisions respecting the responsibility of common carriers for the loss of property entrusted to them for conveyance. Most of the cases were collected or referred to in the opinion of Mr. Justice COWEN, in the case of *Cole* v. *Goodwin*, 19 Wend. 251

It will be sufficient to state the law established by the progressive and decisive weight of authority.

By the common law they were liable for all losses not occasioned by the act of God or the public enemy. They could not refuse to carry a package, and when its contents were not made known to them, they were often subjected to heavy damages without receiving any adequate compensation for the risk incurred. To obtain relief by a limitation of their liability, it became a very general practice to give notice, that they would not be answerable for the loss or damage of goods above the value of five pounds, unless the nature and value were specified and entered, and a premium paid accordingly. The effect of notices of this description was soon presented for judicial determination.

The conclusion, to which the courts ultimately came, was, that they could have no effect, unless brought to the knowledge of the owner of the goods, before he had entrusted them to the care of the carrier. That in such case they would have the effect to prevent a recovery of damages, for a loss not occasioned by the misconduct or negligence of the carrier or his servants, when the owner had not complied with the terms of the notice.

This conclusion appears to have been formed by a consideration, that a person informed of the notice, who intrusted goods to their care without making known their nature and value, consented, that they should be carried upon the terms proposed in the notice, and that a contract to that effect was thus made between the parties, by a proposal for their carriage upon certain terms stated, and by an acceptance of them. *Lyon* v. *Mells*, 5 East, 428.

The notices were usually given in terms so general, that a literal construction of the contract thus arising out of them, would have exonerated the carriers from liability for their own misfeasance or negligence and from that of their servants. Yet the well established construction of them has been, that they were not thereby relieved from their liability to make compensation for losses thus occasioned. *Beck* v.

*Evans,* 16 East, 244; *Smith* v. *Horne,* 8 Taun. 144; *New-born* v. *Just,* 2 C. & P., 76; *Birkett* v. *Willan,* 2 B. & A., 356; *Garnett* v. *Willan,* 5 B. & A., 53; *Sleat* v. *Fagg,* 5 B. & A., 342; *Duff* v. *Budd,* 3 Brod. & Bing. 177; *Brooke* v. *Pickwick,* 4 Bing., 218; *Riley* v. *Horne,* 5 Bing., 217; *Bodenham* v. *Bennet,* 4 Price, 34; Story on Bailm., (4th ed.) § 570, where it is said, "it is clear, that such notices will not exempt the carrier from losses by the misfeasance or gross negligence of himself or servants," "for the terms are uniformly construed not to exempt him from such losses." Kent also states, "it is perfectly well settled, that the carrier, notwithstanding notice has been given and brought home to the party, continues responsible for any loss or damage resulting from gross negligence or misfeasance in him or his servants." 2 Kent's Com. 607. Mr. Justice Cowen, in the case of *Cole* v. *Goodwin,* while speaking of the decisions in Westminster Hall, respecting the liability of a common carrier, says, "it is equally well settled, that he cannot either capriciously, by a single instance, or by public notice, seen and read by his customer, nor even by special agreement, exonerate himself from the consequences of gross neglect."

In many of the cases the words "gross neglect," were used without any definite explanation of their meaning, and for some time it was considered to be doubtful, whether the carrier was not exonerated from losses occasioned by negligence or a want of that ordinary care, for which bailees are responsible. This doubt was removed by the decisions made in *Wyld* v. *Pickford,* 8 Mee. & Welsb. 443, and *Hinton* v. *Dibbin,* 2 Ad. & El. N. S. 646. In the former case, Baron Parke, speaking of a carrier who had given notice, says, "he still undertakes to carry for hire, and is therefore bound to use ordinary care in the custody of goods and their conveyance to and delivery at their place of destination, and in providing proper vehicles for their carriage. It is enough to prove an act of ordinary negligence." In the latter case, Lord Denman observes, "again, when we find 'gross negligence,' made the criterion to determine the liability of a

carrier, who has given the usual notice, it might perhaps have been reasonably expected, that something like a definite meaning should have been given to the expression. It is believed, however, that in none of the numerous cases upon this subject is any such attempt made ; and it may well be doubted, whether between gross negligence and negligence, any intelligible distinction exists." In his first edition of the treatise on Bailments, the law was regarded by STORY to be uncertain whether a carrier would be liable without proof at least of gross negligence. After the case of *Wyld* v. *Pickford* was decided, he says, in the fourth edition, § 571, " the question may however be now considered at rest by an adjudication entirely satisfactory in its reasoning, and turning upon the very point, in which it was held, that in cases of such notices the carrier is liable for losses and injuries occasioned, not only by gross negligence, but by ordinary negligence ; or, in other words, is bound to ordinary diligence."

The cases of *Clark* v. *Hutchins*, 14 East, 475, and of *Mayhew* v. *Eames*, 3 B. & C., 601, cited by the counsel for the defendants, did not turn upon the question of negligence ; and, upon the ground on which the nonsuits were ordered, they are opposed to the general current of the authorities.

A change was made in the law of England, as thus established, by the statute, 11 G. 4, and 1 W. 4, chap. 68. The first section of this statute relieved carriers from their responsibility for the loss or damage of certain enumerated valuable goods, contained in packages or parcels of the value of more than ten pounds, unless their nature and value were at the time of their delivery made known to the carrier, and his increased charge paid or agreed to be paid. The fourth section provided that no public notice should exempt a carrier from his liability at common law, for the loss or injury of goods not enumerated in the first section. By the construction of this statute, adopted in the case of *Hinton* v. *Dibbin*, a carrier is not liable for a loss of valuable goods exceeding ten pounds, occasioned by the gross negligence of his servants, unless their

nature and value are made known according to the provisions of the statute.

Although the doctrines established before the enactment of this statute were received in the State of New York, her courts appear since to have denied, that the responsibility of a common carrier can be restricted by any notice or agreement. *Hollister* v. *Nowlen,* 19 Wend. 234; *Cole* v. *Goodwin, idem,* 251; *Gould* v. *Hill,* 2 Hill, 623. Some of the considerations leading to such a conclusion appear to have been; that many of the English Judges and jurists doubted the propriety of the admission of a restriction by notice, and lamented its introduction; that it had been removed and the rule of the common law restored by the statute, with certain exceptions introduced by it; that the decisions respecting the effect of notices rested upon the unsound foundation, that the carrier could and had divested himself of his public character, and assumed that of a bailee for hire; and that he was not obliged to receive goods for carriage, except upon terms prescribed by himself.

However strongly such and other considerations might have operated, had they been presented to this court at an earlier time, it is not now at liberty to entertain them, without overruling a former decision, (*Bean* v. *Green,* 3 Fairf. 422,) in which it is said, that the attempt on the part of common carriers to limit and qualify the liability imposed on them by the common law, although sustained, is not to be favored or extended. To admit them to be exonerated from liability for losses occasioned by negligence, would be to extend the limitation of it.

Another form of notice, often given by the proprietors of rail ways and stage coaches, "all baggage at the risk of owners," has, when made known to them, been construed not to exempt the proprietors from losses occasioned by negligence. In the case of the *Camden and Amboy Rail Road* v. *Burke,* 13 Wend. 611, Savage, C. J. says, "where notice is given, that all baggage is at the risk of the owners, such notice excuses them from losses, happening by theft or robbery," "but

not from losses arising from actual negligence." In the case of *Dwight* v. *Brewster*, 1 Pick. 50, PARKER, C. J. says, when speaking of a similar notice, "it was intended to guard the proprietors from liability in case the trunks, &c. should be stolen."

Nor do such notices prevent the proprietors from being liable for losses occasioned by neglect to provide sufficient and suitable vehicles and machinery. *Lyon* v. *Mells*, 5 East, 428 ; *Sharp* v. *Grey*, 9 Bing. 457 ; *Wyld* v. *Pickford*, 8 M. & W. 651 ; *Cam. & Am. Rail Road* v. *Burke*, 13 Wend. 611 ; Story on Bailm. (4th ed.) § 557, where it is said, " but at all events such notices will not exempt the carriers from responsibility for losses occasioned by a defect in the vehicle or machinery used for the transportation."

A carrier will be liable for disobedience of directions given and assented to respecting the mode of conveyance. *Streeter* v. *Horlock*, 1 Bing. 34 ; *Hastings* v. *Pepper*, 11 Pick. 41 ; *Demseth* v. *Wade*, 2 Scam. 285 ; Story on Bailm. § 509.

If a literal construction of the agreement signed by the plaintiff would exonerate the defendants from losses occasioned by the negligence of their servants, it will be perceived, that it could not be permitted to have that effect without a violation of established rules of construction, and without a disregard of the declared intention of this court not to extend the restriction of the liability of common carriers. The very great danger to be anticipated, by permitting them to enter into contracts to be exempt from losses occasioned by misconduct or negligence, can scarcely be over estimated. It would remove the principal safeguard for the preservation of life and property in such conveyances.

It however requires no forced construction of that agreement, to regard it as effectual to place the defendants in the position of bailees for hire, and as not exonerating them from liability for losses occasioned by misfeasance or negligence. The latter clause, " we will not call upon the rail road company or any of their agents for any damages whatsoever," considered without reference to the preceding language,

would be sufficiently broad to excuse them from making compensation for losses occasioned by wilful misconduct. It is most obvious, that such could not have been the intention ; and that the true meaning and intention was, that they would not call upon them for any damages whatsoever, " that may happen to any horses, oxen or other live stock, that we send or may send over said company's rail road." The intention of the parties, by the use of the language contained in this last clause, is then attempted to be explained as follows : — " meaning by this, that we will take the risk upon ourselves of all and any damages, that may happen to our horses, cattle," &c. The meaning of damages happening to live animals is to be sought.

The word happen is defined by the words, to come by chance, to fall out, to befall, to come unexpectedly. An accident, or that which happens or comes by chance, is an event, which occurs from an unknown cause, or it is the unusual effect of a known cause. This will exclude an event produced by misconduct or negligence, for one so produced is ordinarily to be expected from a known cause. Misconduct or negligence under such circumstances would usually be productive of such an event. Lord Ellenborough, in the case of *Lyon* v. *Mells,* speaking of what "may or may not happen," explains it as "that which may arise from accident and depends on chance." An injury occasioned by negligence, is the effect ordinarily to be expected as the consequence of that negligence, without reference to any accident or chance. A correct construction of the agreement will not therefore relieve the defendants from their liability for losses occasioned by the misfeasance or negligence of their servants.

It will have the effect to change the burden of proof, and to require that the owner shall prove, that the loss was thus occasioned.

The instructions respecting the liability of the defendants for losses were therefore correct.

It is alleged, that those respecting the directions given by the plaintiff, for the conveyance of his horse, were erroneous.

If the only instruction had been, that " it was enough if such order was given to any agent of the company, there acting for them, whatever may have been the particular duty of such agent," there might have been just cause for complaint. The true rule would seem to be, that an order should be given to some servant or agent, who is acting upon the subject matter, or whose duty it is to act upon it, or to communicate to some one, whose duty it is to act upon it. *Fulton Bank* v. *New York Canal Company*, 4 Paige, 127. But the instructions also stated, " that the plaintiff was bound to bring the knowledge of the special directions, home to the company." If this was done through a servant, whose duty did not require him to act upon, or to communicate the directions, the company would become sufficiently informed of them ; and it could not have been aggrieved by the instructions.

The testimony appears to have been sufficient to authorize the jury to find, that the officers of the company, specially charged with the transportation of freight, were informed of those directions ; and that is all that could have been intended by the instruction, that a knowledge of them should be brought home to the company.

*Judgment on the verdict.*

Note. — Wells, J. took no part in this decision.