# The South & North Alabama Railroad Co. *v.* Henlein & Barr.

*Action against Common Carrier for Failure to deliver Live Animals.*

1. *Agent, acts of one claiming to be ; when admissible against principal.* — The fact and scope of an agency being established, acts of one who was where the agent should have been, and exercising the authority he had, are competent evidence to enable the jury to determine whether such person was in fact the agent; and the fact that this is controverted affects the weight, not the admissibility of the evidence.

2. *Common carrier; how far may restrict common law liability by special contract.* — A common carrier can make no contract protecting him against liability for his own or his servant's negligence, but may, by special contract with the shipper, reasonably restrict his common law liability in other respects.

3. *Same ; burden of proof.* — The carrier cannot escape liability for loss or injury to property transported under special contract, unless he shows not only a loss or injury from a cause within the limitation, but also that it was occasioned without negligence on his part.

4. *Same; responsibility of carrier of live-stock.* — A carrier, undertaking the transportation of live animals, in the absence of a special contract, is chargeable on its common law liability for their safe delivery ; but is not responsible for loss or injuries resulting from their nature or propensities.

5. *Special contract, validity of; how determined.* — Whether a special contract is

---

[1] This case was decided at the January term, 1875.

[The South and North Alabama Railroad Co. v. Henlein.]

reasonable and just must be pronounced by the court, in view of all the attending circumstances.

6. *Same; what is reasonable and just.* — A stipulation in a special contract, entered into in consideration of reduced rates and a free pass to the owner, that he shall attend the live-stock and care for it, at his own expense, in case of accidents, is reasonable and valid; and the carrier, if not wanting in the diligence required of him, is not liable for losses occasioned by the shipper's inattention in these respects.

7. *Same.* — A stipulation in a special contract (entered into in consideration of reduced rates and a free pass to the shipper) that the value at the time and place of shipment, *not to exceed fifty dollars per head for ordinary beef cattle,* should be the measure of recovery for any loss for which the carrier is liable, is just and reasonable, and is the measure of the carrier's liability. (MANNING, J., dissenting on this point).

APPEAL from Circuit Court of Montgomery.

Tried before Hon. JAMES Q. SMITH.

This was an action brought by the appellees, Henlein & Barr, against the appellant, the South & North Alabama Railroad Company, for the failure to deliver a steer received for transportation to Montgomery, Ala.

The steer and nineteen other cattle were delivered at Nashville to the Louisville & Nashville Railroad Company, for transportation to Montgomery, Ala., under a special contract of shipment signed by the railroad agent and the owners of the stock.

This contract, after reciting the receipt of the cattle, name of consignee, and destination, and that connecting lines over which the cattle are transported shall be considered a part of the route, &c., proceeds as follows: " That whereas the Louisville & Nashville Railroad Company and connecting lines transport live-stock only at first-class rates, except when, in consideration of a reduced rate in car-load, the owner and shipper assumes certain risks specified below: NOW IN CONSIDERATION of said railroads' agreeing to transport the above described live-stock at the reduced rate of $75 per car-load, and a free pass to the owner or agent on the train with the stock, the said owner and shipper hereby assumes (and releases said railroad company from) all injury, loss, and damages or depreciation which the animals or either of them may suffer in consequence of either of them being weak, or escaping, or injuring themselves or each other, or in consequence of overloading, heat, suffocation, fright, viciousness, or of being injured by fire, or the burning of any material, while in the possession of the company, and from all other damages incident to railroad transportation, which shall not have been caused by the fraud or gross negligence of the railroad company."

" It is further agreed, that in case of accidents or delays of time, from any cause whatever, the owner and shipper is to feed and water and take proper care of the stock at his own expense."

[The South and North Alabama Railroad Co. v. Henlein.]

" It is also agreed, that the owners and shippers, or his or their agent in charge of stock, shall ride upon the freight train upon which the stock is transported, and do assume (and release said railroad company from) all risk of personal injury while on or about the trains of the company."

" And it is further agreed, that should loss or damage occur for which the company may be liable, the value at the place and date of shipment shall govern the settlement, on which the amount claimed shall not exceed for a stallion or jack $300; for horse or mule $150; cattle $50; other animals $25."

The special contract also contained other stipulations that the cattle were to be loaded and unloaded at the shipper's risk; that while the company would afford the shipper or his agent all proper assistance in feeding and caring for the stock, the running of the trains was not to be delayed thereby, but that a car might be left at any station, for the purpose of feeding and resting cattle, upon the application of the person in charge, and be forwarded by the next freight train. It further recited that the cattle were delivered under the stipulations, conditions, and understandings which have been carefully explained to and fully understood by the owner and shipper. The name of Jacob Strauss, as the person who was to accompany the stock, was given in by the owners and inserted in the contract. The railroad of defendant is one of the connecting lines mentioned in the contract, and extends from Montgomery to Decatur, a distance of 185 miles. It took some fifty-five hours for the freight train to run this distance, which was considerably more than double the time usually required.

On the arrival of the freight train at Montgomery, a steer " one of the best of the lot," weighing 1,500 or 1,700 pounds, and worth from six to seven and a half cents a pound, was found dead. It bore no external marks of violence, and Strauss, the shipper's agent, testified that he was of opinion that it died from " over-heating." The car upon which the steer was, was in good condition and contained only the usual number of cattle.

The witness Strauss, the person employed by the owners to accompany the cattle, testified that he went on the train with the cattle for some distance below Decatur, when, being hungry he got off the freight train and went ahead to Birmingham (a station between Decatur and Montgomery), remaining there until early Sunday morning, and the cattle not having arrived, he came on to Montgomery on the passenger train ; that when he quit the cattle he left no one in charge of them.

The defendant introduced one Cox, its agent at Birmingham, who testified that about 11 A. M. on Saturday a car-load of cattle which he identified as appellee's, arrived at Birmingham

and were then in good condition, and at first, finding no one
in charge of the stock, was about to switch off the car and
feed and water them, as was the custom of defendant when no
one accompanied stock; but at this time a person came up who
appeared to have charge of the stock, and stated that he was
in charge of them and declined witness' offer to switch off the
car, and feed the stock, and refused to permit it to be done;
that it was not defendant's custom to feed and care for stock,
or offer to do so, when in charge of any one, except when
there had been delays. The court, after the testimony was all
in, on motion of plaintiff, excluded the testimony of Cox as to
the refusal of the person, claiming to be in charge of the stock,
to allow the stock to be fed, and the witness' offer to do so, on
the ground that defendant had not shown that such person was
plaintiff's agent; to which ruling exception was duly reserved.

There was testimony on the part of the defendant to the
effect that there was no regular schedule for freight trains;
that none had been given out or published; that the freight
trains ran by telegraph, and their movements were controlled
by the amount of business and trains on the road; but the
same testimony showed that the usual time between Decatur
and Montgomery was twenty-four hours. It was not shown
what occasioned the delay in the present case.

The court, at the request of the defendant, gave several
written charges, and refused others asked by it. Among the
charges thus refused was one which instructed the jury, " in
event the defendant was liable, that they could not assess the
damages at a greater sum than fifty dollars, with interest
from the date of the death of the ox." Another asserted
that, under the special contract, the burden of proof as to
negligence, and the cause of the loss of the ox, was upon the
plaintiff, and not shifted by proof of the death of the ox.
Others asserted that under the contract of shipment the de-
fendant was not liable as a common carrier; that mere delay
upon the road was not of itself evidence of negligence; that
the evidence in relation to the death of the steer was insuf-
ficient to show negligence on the part of the defendant; and
that if the jury believed the ox would not have died if he had
been watered, to find for defendant. To each of these refusals
the defendant duly excepted. The jury rendered a verdict in
favor of the plaintiffs for $75. As the court did not pass upon
the correctness of each of these charges in detail, it is unneces-
sary to refer to them more specifically. The exclusion of the
testimony of the witness Cox, and the refusal to give the
charges requested, are now assigned for error.

RICE, JONES & WILEY, for appellant.

[The South and North Alabama Railroad Co. *v.* Henlein.]

SANFORD & MOSES, *contra.*

BRICKELL, C. J. — The contract of shipment contemplates that the owner or his agent shall attend the live-stock while in the course of transportation, and imposes on him the duty of feeding and watering them, at his own expense, if delays or accidents occurred. The stock left the place of shipment in charge of an agent of the owner, who was with them, when delivered to the appellant. The cause of the death of the animal, for the loss of which a recovery is sought in this case, was matter of controversy in the circuit court. Delays in transportation had occurred, and it may have been supposed the want of food and water, during the delay, was the cause of death. The appellant, to relieve itself from all imputation of negligence in this respect, offered to prove that at Birmingham, after the delays, when no visible injury had happened, its agent proposed to a person, claiming to be in charge of the stock, to switch off the car, on which the stock was loaded, and feed and water them. This person refused to permit this to be done. The court excluded this evidence, because not connected with other evidence, that the person to whom the proposition was made was the agent of the owners.

The acts or declarations of one professing to be the agent of another are not binding on the principal until his authority is shown, or the assent to, or ratification of such acts or declarations. *McClung* v. *Spotwood*, 19 Ala. 165.

When the fact of agency rests in parol, its existence and the extent of the authority conferred are matters of fact for the determination of the jury. Whatever evidence has a tendency to prove the agency is admissible. In the case cited, C. J. DARGAN said : " The correct rule is this, if there be no proof whatever tending to prove the agency, the act may be excluded from the jury by the court; but if there is any evidence tending to prove the authority of the agent, then the act cannot be excluded from them, for they are the judges of the weight and sufficiency of the testimony." In determining the admissibility of evidence, its sufficiency must be lost sight of in a great degree; it may be weak and inconclusive, yet if it is relevant and has a tendency to prove a material fact, it cannot be excluded without invading the province of the jury. When the fact offered to be proved is connected with the fact that the contract of shipment contemplates the presence of the owner or his agent during the transportation of the stock, and imposes on him the duty of watering, feeding, and caring for them, and with the fact that when the stock left the place of shipment they were in charge of an agent, who was with them when delivered to the appellant; the evidence offered was admissible. The fact that the

person to whom the offer was made was in charge of the stock, claiming to be the agent, in connection with these facts, had a tendency to show he was the agent; and in the absence of contradictory evidence might have been received by the jury as sufficient. He was where the agent should have been, and exercising the authority the agent had. The point of dispute is not whether the owners had an agent who should have been in charge of the stock at the time and place of the offer, but whether the person to whom the offer was made was such agent. The existence of an agency not being controverted, the evidence should have gone to the jury, and under proper instructions from the court they should have determined whether the person to whom the offer was made was or not appellee's agent. The evidence given by the appellees that their agent left the train conveying the stock before it reached Birmingham, and was not there when the train arrived or left, does not affect the admissibility of the evidence rejected. It was contradictory of the fact that the person to whom the offer was made was the agent of the appellees; but the fact that evidence is in conflict with or contradictory of other evidence is not involved in an inquiry as to its admissibility. Its credibility and sufficiency is affected by such conflict or contradiction, and there the duty of the jury intervenes to determine the weight it should receive in view of the conflict.

The charges refused by the circuit court were framed with reference to stipulations in the special contract of shipment. The contract purports to have been made by the shipper in consideration of a reduced rate of freight, and a free pass to him or his agent, on the train with the stock to be carried. One of the stipulations is thus expressed : " The said owner and shipper hereby assumes (and releases the said railroad) from all injury, loss, and damage, or depreciation, which the animals, or either of them, may suffer in consequence of their being weak, or escaping, or injuring themselves or each other, or in consequence of overloading, heat, suffocation, fright, viciousness, or being injured by fire, or the burning of any material while in the possession of the company, *and from all other dangers incident to railroad transportation, which shall not have been caused by the fraud or gross negligence of said railroad company.*" The other stipulations, so far as necessary to be considered in this case, are, " That in case of accidents to, or delays of time from any cause whatever, the owner and shipper is to feed, water, and take proper care of the stock, at his own expense;" and if loss or injury for which the carrier may be liable should occur, the value at the time and place of shipment should govern the settlement, and the amount claimed should not exceed fifty dollars for any one of the stock.

[The South and North Alabama Railroad Co. v. Henlein.]

By the common law a common carrier is absolutely liable for the safety of goods intrusted to him for transportation. Whatever loss or injury may happen, he must answer for, unless he shows it was caused by "the act of God, or of a public enemy, or by the fault of the party complaining." 1 Smith's L. C. 315. When a loss or injury happens, the *onus probandi* rests on the carrier to exempt himself from liability; for the law imposes on him the obligation of safety. The owner or shipper is bound to prove no more than that the goods were delivered to the carrier, and the failure to deliver them safely. These facts are *primâ facie* evidence of negligence or misconduct. *Steele & Burgess* v. *Townsend*, 37 Ala. 247; Pierce Am. R. R. Law, 467; 1 Smith L. C. 318. The carrier may, by special contract with the shipper, limit his common law liability; but no limitation of his liability can relieve him from responsibility for loss or damage resulting from his own negligence. *Steele & Burgess* v. *Townsend, supra; So. Ex. Co.* v. *Crook*, 44 Ala. 468; *York Co.* v. *Central Railroad*, 3 Wall. 107; *R. R. Co.* v. *Lockwood*, 17 Wall. 357; *S. E. Co.* v. *Caperton*, 44 Ala. 101; *M. & O. R. R. Co.* v. *Hopkins*, 41 Ala. 486; *M. & O. R. R. Co.* v. *Jarboe*, Ib. 644. If a special contract is made and a loss or injury occurs, the carrier cannot claim exemption from liability, unless he shows not only that the cause of the loss or injury was within the limitation of the contract, but that it was without negligence on his part. *Steele & Burgess* v. *Townsend, supra*, and authorities there cited; 2 Redf. Railways, § 160.

It is only since the introduction of railways, and they have become the principal agencies in transportation by land, that the carriage of live-stock has grown to be an important branch of the business of common carriers. Whether the carrier shall be subjected to the duties and liabilities defined by the common law in reference to mere inanimate chattels, or whether he should be regarded as a special agent for transportation, bound only to furnish suitable and safe carriage and motive power, and responsible only for the defects in these, in the absence of a special contract, can scarcely be deemed a settled question. The principal authorities are collected in Wharton on Negligence, §§ 615-21. It would serve no good purpose to extend this opinion by undertaking to review them.

A common carrier is in the exercise of a public employment, and has public duties to perform. When he has a regularly established business for the carriage of all or of certain articles, and as is said by the supreme court of the United States in the recent case of *R. R. Co.* v. *Lockwood, supra*, "especially if that carrier be a corporation created for the purposes of the carrying trade, and the carriage of articles is embraced within the scope of its chartered powers," it is a duty he owes the public

to receive all freight offered him not without the line of his employment, and safely to transport it at reasonable charges. 1 Smith's L. C. 315; Ang. on Carriers, § 124; *H. L. S. H. Co.* v. *Merchants' Bank*, 6 Hurd. 344; Edw. on Bailments, 443; 1 Chit. Con. 684–87; Redf. Railways, § 138. The rules of the common law prescribing his duties and fixing his liabilities are intended for the protection of the public, and it would offend the public policy, in which these rules have their foundation, if they were not extended so as to embrace every species of property which becomes the subject of transportation by carriers. The carrier voluntarily assumes the employment because of the profits expected to flow from it, and the rights and remedies the law affords him to secure these profits. He can demand his compensation when the thing is offered him for transportation, and may refuse to receive it unless it is paid. Ang. on Carriers, § 124. If without demanding freight in advance he carries the goods, the law gives him a lien on them for the reasonable price of their carriage, and he may detain them until it is paid. Edw. on Bailments, 547.

These are rights attaching to every species of property he may assume to carry, and the corresponding duty and liability the law fixes on him should also attach. We prefer, therefore, to follow the authorities, which hold that unless modified by special contract, " the common law liability of a carrier for the delivery of live animals is the same as that for the delivery of merchandise. Upon undertaking their transportation he assumes the obligation to deliver them safely against all contingencies, except such as would excuse the non-delivery of other property." *Smith* v. *N. H. & N. R. R. Co.* 12 Allen, 531; *Squire* v. *N. Y. Cent. R. R. Co.* 98 Mass. 239; *White* v. *Winnisimmet Co.* 7 Cush. 155; *Wilson* v. *Hamilton*, 4 Ohio St. 722; *Hall* v. *Renfroe*, 3 Met. (Ky.) 51; *Kansas R. R. Co.* v. *Nichols*, 9 Kan. 235; *Kimball* v. *R. & B. R. R. Co.* 26 Verm. 247; *Palmer* v. *Grand Junction R. R. Co.* 4 Mees. & Wels. 748.

The common law admits a qualification of the carrier's liability dependent on the nature of the thing to be carried, and the extent of his custody and control over it. He was never liable for losses resulting from the perishability of the thing transported, from its ordinary deterioration in quality or quantity, or from its inherent infirmity and tendency to decay. Ang. on Car. § 210; Story on Bail. § 492. He was bound to take reasonable care of perishable goods, so that as little loss as possible should result from their infirmities, but observing this, he was not responsible for damages resulting from their nature. Slaves — as to the title of the owner, his power of disposition — were chattels; yet a carrier of them was not subjected to the liability imposed on him in the carriage of inanimate

chattels.   The liability incurred was measured by the nature and character of the slave, as a human being, and assimilated to that assured to passengers.  *Boyer* v. *Anderson*, 2 Pet. 150 ; *Williams* v. *Taylor*, 4 Port. 234.   Adopting the language of Wharton : " Live animals have the power of voluntary motion, and have in them qualities of disturbance and perishability which cannot be determined until they are tried by this partic- ular mode of conveyance.   The quietest ox may be possessed, by a frenzy of passion when placed in a freight car with the engine screaming ahead of him, the' boards shaking underneath him, and the train rumbling and jerking behind.   Even strength and endurance, in stiffening the brute system to a mere con- tinuously excited bracing up against the motion, may prove a greater hinderance to safe travel than the supple weakness which yields helplessly to the jar.   There are features, there- fore, of ' live-stock ' which take them out of the category of ' goods.' "   Wharton on Negligence, § 615.   They may die or deteriorate in value from refusing food or water, or from disease which may be aggravated by the mode of conveyance, or the length of the journey.   A carrier who has observed all proper care and foresight to avoid loss and injury, would not be chargeable if it resulted from the nature of the animal, on the same principle that he is exempted from liability for the de- terioration or decay of perishable goods.   The measure of lia- bility must be modified or varied, so as to be adapted to the nature of the thing to be carried.  *White* v. *Winnisimmet Com- pany, supra ; Hall* v. *Renfroe, supra ; Penn. Buffalo & Erie R. R. Co.* 29 N. Y. 204 ; Ang. on Carriers, § 214 ; 2 Redf. Railways, § 168, and notes.   There may be cases in which the thing carried is not surrendered into the custody and care of the carrier, but the owner accompanies and retains possession of it.   In such case the liability of the carrier is more re- stricted, and the owner is bound to use all reasonable diligence to prevent loss or injury.  *White* v. *Winnisimmet Co. supra ; Wilson* v. *Hamilton, supra ; Brind* v. *Dale*, 8 Car. & P. 207. In all cases of this kind, keeping in view that the law casts the *onus probandi* on the carrier, the cause of the loss is a matter to be determined by the jury on the evidence before them.

In the absence of a special contract, on the carrier transport- ing live-stock would devolve the duty of watering, feeding, and bestowing other care, which from their nature and condition they require.   By special agreement, the owner or agent may be placed in charge of them, and this duty transferred to him. When the stock is transported under such special agreement, if the carrier provides adequate carriages, affords reasonable and proper opportunities to the owner or agent to care for the stock, subjects them to no unnecessary or unreasonable delays

in transportation, he cannot be held responsible for loss or injury resulting from the want of food, water, or other care. Wharton on Neg. § 618.

As we have said, a common carrier may, by special contract with the shipper, limit his common law liability, but no limitation can relieve him from liability for loss or injury resulting from his own negligence. Such a limitation would be adverse to the policy of the law, fixing his liability, and cannot be regarded as just and reasonable, when the relative position of the carrier and shipper is considered.

The stipulation in the special contract, by which the owner assumed the duty of watering, feeding, and caring for the stock, at his own expense, is valid, and for loss or injury resulting from a want of attention in this respect, the carrier is not liable if he was not wanting in the diligence the law required of him, — if he furnished adequate carriage, afforded reasonable opportunities to the owner, or his agent, to care for the stock, and subjected them to no unnecessary delay in transportation.

The stipulation that the carrier should not be liable, in consequence of the weakness of the animals, or of injury they inflicted on each other or themselves, or, in consequence of fright or viciousness, is but a stipulation against liability, because of the nature of the thing carried, and does not materially differ from the rule of law, in the absence of a special contract. The facts of this case do not require us to express any opinion on some other exceptions from liability, with which these are connected.

The general exception that the carrier shall not be liable for any " *other damages incident to railroad transportation, which shall not have been caused by the fraud or gross negligence of said railroad company,*" if it is to be construed as relieving the company from the degree of care and negligence exacted by the common law would be unjust and unreasonable, and could not be maintained. From that care and diligence he cannot be released. The limit to which he may contract for exemption is freedom from liability for damages, not arising by his own or his servants' negligence. Any want of the diligence they are bound to observe is negligence. *Sager* v. *P. & S. & P. E. R. R. Co.* 31 Me. 228.

When a carrier relies on a special contract, on the court rests the duty of pronouncing, in view of all the circumstances attending it, whether it is just and reasonable. 1 Chit. Con. 692. We have had much difficulty in determining the validity of the stipulation in the contract, that if loss or injury should occur, for which the company is liable, the amount claimed should not exceed fifty dollars for any one of the ani-

mals. If the measure of the liability thus fixed appeared to be greatly disproportionate to the real value of the animal, and the amount of freight received, we should not hesitate to declare it unjust and unreasonable. But as the case is presented, it seems to have been intended to adjust the measure of liability to the reduced rate of freight charged, and to protect the carrier against exaggerated or fanciful valuations. We cannot therefore pronounce it unjust and unreasonable, and it is the measure of appellant's liability. 2 Redf. Railways, § 161 ; *Squire* v. *N. Y. Cent. R. R. Co.* 98 Mass. 239 ; *Farnham* v. *Camden & Amboy R. R. Co.* 55 Penn. 53.

We do not intend to depart from the ruling of this court in *S. E. Co.* v. *Crook*, 44 Ala. 468, on this point. That decision we do not doubt is correct, and it is not in conflict with the authorities to which we have referred, nor with the view we have expressed. It was clear in that case the term *package*, employed in the special contract, had no reference to *bales of cotton*, the things carried, and for the loss of which the carrier was held liable. There is in this case a special contract in reference to the things which are the subject of transportation, based upon a sufficient consideration clearly expressed, — a reduced rate of freight, and fixing the maximum of the carrier's liability, in the event of loss or injury. This maximum does not appear to be grossly disproportionate to the value of the animal lost. For any greater measure of liability the shipper did not pay freight.

Without noticing separately the several charges refused, which are the subject of exception, an application of the rules asserted will enable the circuit court to dispose of the case correctly. The judgment is reversed and the cause remanded.[1]

MANNING, J. — I am unable to assent to the decision of the court upon the last point presented in the opinion of the chief justice. It seems to me that a railway company ought not to be allowed to stipulate, in such a case as the one before us, for exoneration from a portion, any more than from the whole of a loss which is caused by its negligence, or that of its employees. Public policy requires that the principle involved in this matter should be kept as free as possible from qualification. And the rule arising out of it ought to be so sharply defined and steadily upheld, as to discourage all endeavors to avoid it, or to escape from its control.

It is not necessary to express any opinion in respect to the question whether the evidence in this cause shows that the

---

[1] This case was decided at the January term, 1875, but was in use by the court when the opinions of that term were being printed.

railroad company, or its agents were, in truth, guilty of any negligence or misconduct, on the occasion out of which this suit arose.   That was a matter of fact to be determined by the jury.

Nor must it be supposed that I hold it to be unreasonable or unlawful for common carriers to stipulate that they shall not be responsible for extraordinary values, not made known, put upon horses, dogs, or cattle, on account of qualities not obvious to casual inspection, — such as great speed, fine pedigree, or the like, which give to them exceptional value for the turf, to breed from, or for other purposes.   Animals of this sort afford opportunities for those " extravagant and fanciful valuations " mentioned in a case cited on behalf of appellant.   And the stipulation of the carrier that he shall not be subject to such valuations, upon a contract for the transportation of them as ordinary animals of their kind, is authorized by the same principle which allows him to make a like stipulation in respect to the unknown value of goods in packages.   Indeed, the principal case which has been referred to as a precedent for such a contract as that under consideration was a contract of that sort.

A gentleman going from London by railway into the country took along two horses and a dog, for which he paid fare and took a ticket, annexed to which was a condition, or special contract, signed both on his behalf and that of the company.   In it was this stipulation : " The company will not be liable in any case for loss, or damage to any horse or other animal, above the value of £40, or any dog above the value of £5, unless a declaration of its value signed by the owner, or his agent, at the time of booking the same, has been given to them. . . . . If the declared value of any horse or other animal exceed £40, or any dog, £5, the price of conveyance will, in addition to the regular fare, be after the rate of 2 per cent. or 6d. in the pound," &c.   In the course of the journey the dog escaped through a window, and was lost to the owner.   And the owner brought suit against the company for £21, the value of the dog, in the court of queen's bench.   In that court, the decision was against the company.   COCKBURN, C. J., said : " I think it right at the outset to say that upon the facts stated in this case, we should not be justified in drawing the inference that there was actual negligence on the part. of the company.   My judgment proceeds upon the ground, that the ticket by which the company proposed to convert their common law contract into a special one, is void," &c.   BLACK-BURN, J., agreed with him.   On appeal to the exchequer chamber, it was held there also, that there was no negligence on the part of the company ; but a majority of the judges held

that the stipulation was valid. *Harrison* v. *London, B. & S. C. R. Co.* 2 Best & Smith, 122 & 151.

In this case, it will be observed that the contract was like that which express and railroad companies frequently make respecting goods in packages, in regard to which the common carrier may limit his liability to a certain sum, unless the owner will declare the value, and pay freight for it accordingly.

But the cattle transported under the contract we are considering were such as are usually conveyed to market to be sold as beeves. They were, obviously, to be appraised as such. The owner or shipper of them did not at any time claim that he should be allowed a higher price for any of them than stock of that kind would fetch in the market. And to them, the observations are applicable, which were made by PECK, C. J., in the *Southern Express Co.* v. *Crook,* 44 Ala. 468.

In that case, it was argued that if the company was liable at all, the receipt it gave for the bales of cotton, about which the controversy arose, limited responsibility to fifty dollars per bale. Speaking of goods contained in packages, which prevented any judgment in respect to their value, Judge PECK said : " In such cases, there would seem to be great propriety in having their value named, to enable the carrier to make a charge answerable to the responsibility he would assume, and at the same time, inform him of the care required to be taken of them. . . . . But where the appearance of the article itself indicates its value, and advises the carrier of the care usually taken in the transportation of such articles, the necessity of having its value stated is not perceived. In such cases the carrier is liable, although nothing is said by the shipper about their value ; " meaning, of course, in a case in which the receipt or contract requires, as in that case it did, that if the shipper did not declare the value, it should not be assessed at a higher sum than that specified in the instrument. For, there would be no occasion to say, if the carrier was liable at all, that he would be liable for the value of such articles, if the contract did not restrict the liability. Judge PECK proceeded to say : " It may, no doubt, be safely said that the value of cotton is as well, and perhaps, as a general thing, better known to the carrier than to the shipper. Its value depends upon the public markets, the knowledge of which is open alike to both parties ; there is, therefore, no real danger that any deceit or fraud will, or can be practised upon the carrier." The same is true in respect to beef cattle, as well as to cotton. The next paragraph in the opinion quoted from indicates that Judge PECK inferred that the stipulation in the instrument under consideration was not intended to embrace bales of cot-

ton. But the observations quoted present good reasons why such a contract should not be allowed, in respect to such articles, to be valid.

In other respects, and as transportable goods, cattle differ, of course, very much from bales of cotton. Being "live-stock," they are, when crowded together and conveyed on railway cars, liable to perish from hunger, to be suffocated, to become frantic from pain or fright, to be gored or trampled to death, or otherwise killed or hurt. The law, therefore, allows railway companies to stipulate with the owner or shipper, in consideration of reduced rates of freight to be paid by him, that he shall undertake to send a messenger along to feed and take care of them, and assume the risk of all losses that may result from such causes of destruction or disaster as inhere in the nature of the things carried, without negligence or misconduct on the part of the carrier. All this has been sufficiently explained in the opinion just read in this cause, and is almost in harmony with the common law on the subject.

But in my opinion the condition or agreement in this contract, that if losses happen by causes for which the company shall be responsible, as by negligence or misconduct on the part of its employees, — it shall be chargeable only according to the value of the cattle at the place of shipment, *and in no case, with more than fifty dollars for any one of them,* is not justified by the law relating to common carriers.

Of this term of the contract it is to be remarked that it does not at first seem to be unjust. It rather strikes the mind as being equitable. It is, however, more specious than fair. Fifty dollars a head may be nearly a true average value of a car-load of cattle. But the company does not agree to pay that sum for any one without respect to value, that may be killed by reason of its negligence or that of its servants. It will pay for the loss of an inferior animal no more than it is worth, though this be only twenty or twenty-five dollars. And if the animal killed be worth $80⁰⁰ or $100⁰⁰, the company will not pay for it more than $50⁰⁰. The ox which is the subject of this controversy (according to the evidence) weighed between 1600 and 1700 pounds, and was worth from six to seven and a half cents per pound. The jury assessed the damages for it at $75⁰⁰. And it is insisted that, in pursuance of the special agreement, the railroad company must not be required to pay more than two thirds of this sum.

Ought such a contract to be upheld by the courts? If the sum mentioned in the contract is to be the *maximum* of liability, it ought also to be a *maximum* value, — that is, the value of one of the best of the cattle conveyed, — else it seems to me the contract is unequal and unjust. And yet a contract with

such a fair *maximum*, in respect to the carriage of such kinds of property, would be equivalent only to one without any limitation of liability at all; and, therefore, there ought not to be any.

True, the old rules of the common law in respect to common carriers have been much relaxed. And this has been effected mainly through the allowance extended by the courts to notices given and contracts made from time to time by common carriers with persons in need of their services. Some of the alterations thus brought about were doubtless justified, perhaps required, by the great changes which have taken place in the methods of commercial intercourse, and in the condition of society. But we sometimes see also expressions of judicial regret at the extent to which courts have gone in emancipating that important class of agents from the strict obligations to which a high public policy subjected them. And it is very probable that the powerful corporations that have almost monopolized, of late, the business of common carriers, have had great influence in accomplishing that result.

An eminent English judge, referred to by Judge BRADLEY, in his very able and masterly opinion in *Railroad Co.* v. *Lockwood* (17 Wall. 357), said in 1863, that the cases decided in the English courts, " between 1832 and 1854, established . . . . that a carrier might, by a special notice, make a contract limiting his responsibility, even in the cases here mentioned of gross negligence, misconduct, or fraud, on the part of his servants ; " and " that it seemed to him that the reason why the legislature intervened in the railway and canal traffic act of 1854, was because it thought that the companies took advantage of those decisions (in Story's language) ' to evade altogether the salutary policy of the common law.' " Thus the parliament of England had to come to the aid of the courts to hold those great companies in check. *Peck* v. *No. Staf. R. R. Co.* 10 Ho. of Lds. Cases, 473.

The act of parliament referred to authorized the judges of the courts to decide upon the reasonableness of stipulations in a contract for carriage of goods, and to allow such stipulations or declare them void, accordingly.

In this country, likewise, — in the State of New York, especially, and in some other states, — the courts have yielded too much ground under (probably) a like pressure. Eminent and estimable citizens are presidents, directors, engineers, and stockholders in these corporations, and naturally desiring for them the largest privileges and immunities, impress their own views upon persons in authority. The ablest counsellors and advocates in the legal profession are retained as advisers of these institutions. Whenever a point is gained, it is secured and

[The South and North Alabama Railroad Co. *v.* Henlein.]

made available by being immediately put into their notices and contracts. And there are few courts of any eminence, in which it has not been complained of as unwarrantable tyranny, to hold that free citizens may not validly make with these corporations any contracts which they may mutually agree upon relating to the transaction of their own business.

"It is a favorite argument" (says Justice BRADLEY) "in the cases which favor the extension of the carrier's right to contract for exemption from liability, that men must be permitted to make their own agreements, and that it is no concern of the public on what terms an individual chooses to have his goods carried." "But" (he asks) "is it true that the public interest is not affected by individual contracts of the kind referred to? Is not the whole business community affected by holding such contracts valid? If held valid, the advantageous position of the companies exercising the business of common carriers is such, that it places it in their power to change the law of common carriers, in effect, by introducing new rules of obligation.

"The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He cannot afford to higgle or stand out and seek redress in the courts. His business will not admit of such a course. He prefers rather to accept any bill of lading, or sign any paper the carrier presents, — often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this, or abandon his business."

These observations were made by Judge BRADLEY, in a case in which suit was brought against a railway company for the death, by the fault of its servants, of a person who was travelling upon a free ticket, as a messenger in charge of live-stock transported, as in the cause before us, in railway cars; in which ticket it was stipulated that the company should not be liable for any accident or disaster that might happen to him. And Judge BRADLEY, by his thorough examination into, and clear exposition of the obligations upon railway carriers in this opinion, and the supreme court of the United States in unanimously concurring in and acting upon the views he presents, have rendered a signal service to the whole country, and established positions for the control of such companies which the other courts of the land ought resolutely to maintain.

The supreme court of Alabama has not gone astray on this subject. In *Steele & Burgess* v. *Townsend* (37 Ala. 247), a case of transportation by sea of hollow cast-iron ware, it was held that although a common carrier might by special contract limit his liability in respect to goods of a perishable nature, or easily damaged, yet the character of common carrier was not

thereby put off, — as had been held in some courts of high authority. "When, therefore" (said R. W. WALKER, J.), "a carrier, as in this case, provides against accountability for 'rust or breakage,' the proper construction of the exception is, that the carrier is not to be held liable as an insurer for 'rust or breakage' which occurs *without negligence on his* part; but that he remains, as before, responsible for any injury of the kind mentioned, if caused by his failure to exercise the degree of care which the law demands of every common carrier in respect to the goods committed to him."

To the same effect is the decision in *Mobile & O. R. R. Co.* v. *Jarboe* (41 Ala. 644), in which it is held : "A common carrier may legally contract for exemption from that responsibility imposed by the common law, by which he becomes an insurer. But on grounds of *public policy*, he cannot go farther than this in the limitation of his liability, by special contract."

In *Mobile & O. R. R. Co.* v. *Hopkins* (41 Ala. 486), the plaintiff below was a passenger with a free ticket, on which was this stipulation : "The person accepting this free ticket, *in consideration thereof*, assumes all risk of accident, and expressly agrees that the company shall not be liable under any circumstances, whether of the negligence of their servants or otherwise, for any injury to the person or property." The company was sued for the value of the baggage of this passenger, lost (as it was charged) by the negligence of its servants. The court said : "Railroad companies are incorporated, in part at least, from public considerations, and for the public good. As carriers of persons and property, it has been held they may be considered as acting in a public capacity, and as a kind of public officer. *The exercise of honesty, care, and diligence* by them, their agents, and employees, is *a public duty* resulting from their position, the obligation to perform which *cannot be thrown off by contract.* If thus thrown off, the effect would be to relax, or modify the performance of the duty, and to promote the relaxation of proper care in the selection of agents and servants for its performance." It was, therefore, held that the company was bound to pay the value of the lost baggage.

And in *Southern Express Co.* v. *Crook, supra*, this court held that although the liabilities of common carriers " may be reasonably limited by special contract, public policy will not permit a common carrier in this way to be exempted from damages for losses occasioned by the negligence or misfeasance of himself or his servants."

This is the doctrine of almost all of the American courts. A leading case affirming it is that of the *New Jersey Steam Nav.*

*Co.* v. *Merchants' Bank*, 6 How. U. S. R. 384. And it is recognized to be law, in the opinion just read by the chief justice in this cause. Indeed, it is one of the few rules that remain, which is almost universally acknowledged in this country to be binding on common carriers, and yet is the subject of continual assaults. It ought, therefore, to be maintained and enforced with a firm hand, rather than frittered away by plausible exceptions and modifications.

A case precisely parallel with the present, in the matter now under consideration, has not come under my observation; that is, a case of limitation of liability to a sum less than the value of the property involved, when such value is easily judged of, and the property open to view, and the loss of it is caused by the misconduct or negligence of the company's servants.

The case most nearly like it in these aspects is that of *The Southern Express Co.* v. *Crook*, *supra*. The decision in it was the same that the rule contended for would have produced, and the argument supports the rule; though it is not clear that the decision is not founded in part upon the idea, that the clause of limited liability in that case was not intended to relate to bales of cotton, as much as upon the purpose of holding it void, if it was intended to embrace them. Still it is an authority for the latter proposition.

True, it is said in *Squire* v. *N. Y. Central R. R. Co.* (98 Mass. p. 245), " The stipulation that they should not, under any circumstances, be held liable beyond the sum of $200, for injury to, or loss of any single animal, was a proper and lawful mode of securing a due proportion between the amount for which they might be responsible and the freight which they received, and of protecting themselves against extravagant and fanciful valuations." But this term of the contract was not then before the court for adjudication. The animals transported were hogs, no one of which was worth, perhaps, one fourth of the sum prescribed. And the court, besides, held that the death of many of them by suffocation was attributable to the negligence of the person in charge of them for the shipper, instead of that of the railroad employees, for which reason the company was not liable for them at all. Moreover, the authorities cited in support of the *dictum* quoted above, related either to animals that are sometimes called " fancy stock " (the dog before referred to), or to commodities in packages which prevented the carrier from judging of their value, and charging for them accordingly.

If railway companies may, by fixing a high tariff of rates, coerce shippers, in consideration of reduced charges, to accept one third less, as in this case, than the value of the property, the character and general value of which are obvious to in-

spection, that may be destroyed by the negligence of the carriers' agents, the principle is seriously broken in upon. Why may they not in the same manner and in like cases, coerce shippers to abate forty *per cent.* or fifty *per cent.* from the value, or release the companies entirely? And why may not such a stipulation be made in respect to other products, — for instance, cotton in bales, — as well as to cattle?

In *Maving* v. *Todd* (1 Stark. R. 72), involving a similar question, " Holroyd submitted whether the defendants could exclude their responsibility altogether. This was going further than had been done in the case of carriers, who had only limited their responsibility to a certain amount.

" LORD ELLENBOROUGH : Since they can limit it to a particular sum, I think they may exclude it altogether."

Subsequently he said : " I am sorry the law is so, it leads to very great negligence."

What flaw or fault is there in the logic of Lord Ellenborough ? The only way of preventing the regret hereafter which he has here expressed, is to be strict in preserving the rule in question unimpaired by clauses of restricted liability for losses occasioned by the negligence or misconduct of the carrier's servants, when the property carried is open to view and its general value easily estimated.